Filed 1/11/23  Ghazarian v. Saperstein CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ARMOND GHAZARIAN et al., | B307904 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC635257) |
| v. | |
| RICHARD SAPERSTEIN et al., | |
| Defendants and Respondents. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Stephanie M. Bowick, Judge.  Affirmed.

The Jamison Law Firm, Guy E. Jamison, Chelsea M. Clayton; Mazur & Mazur and Janice R. Mazur for Plaintiffs and Appellants.

Rufus-Isaacs Acland & Grantham and Alexander Rufus-Isaacs for Defendants and Respondents.

_____

Plaintiffs and appellants Armond Ghazarian dba Car Expert, Saro Diashian, and Good Vibes productions, LLC (collectively, appellants) appeal from judgments entered against them after the trial court granted the summary judgment motions of defendants and respondents Richard Saperstein, Brian Witten, The Genre Company, Inc., and Elysium Films, Inc. (collectively, respondents) in this action for breach of contract, fraud, and other causes of action, arising from appellants' monetary investments in respondents' independent films. Appellants contend the trial court erred in excluding their expert's conclusions and opinions and in declining to consider certain theories of liability. They also contend they have shown triable issues of material fact precluding summary judgment. For the reasons explained below, we reject appellants' contentions and affirm the judgments.

## BACKGROUND

### I. The Investment Agreements

At all times relevant to the causes of action appellants assert in this action, defendants and respondents The Genre Company, Inc. (Genre) and Elysium Films, Inc. (Elysium) were film production companies. Appellants invested money with Genre for the development of certain films, under investment agreements described below. Other plaintiffs in this action, who are not parties to this appeal, invested money with Elysium for the development of other films. Defendant and respondent Richard Saperstein is a film producer, who was an officer of Genre and Elysium. Defendant and respondent Brian Witten is a film producer, who worked with Saperstein on the development of the films at issue in this appeal. Saperstein and Witten signed the investment agreements plaintiffs and appellants Saro

2

Diashian and Ghazarian dba Car Expert (Ghazarian) entered into with Genre; only Saperstein signed the investment agreement plaintiff and appellant Good Vibes entered into with Genre.

### A. Plaintiff and appellant Saro Diashian

On February 8, 2011, Saro Diashian (Saro)[1] entered into a "Development Funds Investment Agreement" with Genre. Thereunder, Saro contributed $25,000, and he and Genre agreed Genre "may utilize the Contribution to pay for any costs in connection with the development of the Picture [known as 'The Blob'] as Company [Genre] deems appropriate." The agreement provides that if the film The Blob is produced before the "deadline" (defined as 14 months after the date of the agreement), Saro is entitled to "reimbursement" (defined as "an amount equal to one hundred and fifteen percent (115%) of the Contribution"), not later than the first day of the film's principal photography. If the film The Blob has not commenced principal photography by the same "deadline," at any time after the deadline, Saro may elect to receive his "reimbursement" from the adjusted gross receipts (AGR), "if any," "actually paid" to Genre on "The Barrens" or "Silent Night, Deadly Night" (Silent Night), two of Genre's other film projects. The agreement also states that if the reimbursement amount has not been paid to Saro from production funds of The Blob or AGR on The Barrens or Silent Night, Genre "shall repay the amount of the Reimbursement to

---

[1] Hereafter, we refer to plaintiff and appellant Saro Diashian by his first name because his relative, Sam Diashian (Sam), also invested money with Genre and is involved in events at issue here, although he is not a party to this action.

3

[Saro] from any amounts Richard Saperstein and/or Brian Witten are personally entitled to receive from any of the Company's film projects other than" The Blob, The Barrens and Silent Night. The agreement also provides for contingent compensation (an enumerated percentage of AGR on each of the three named films) and an associate producer credit on The Blob "[i]f the Picture is produced." The agreement states Genre "does not make any express or implied representation, warranty, guarantee or agreement as to the amount of Gross Receipts or Adjusted Gross Receipts which will be derived or received from the distribution or other exploitation of any of the Pictures" (the three named films).

The Barrens and Silent Night were produced before appellants filed this action. The Blob was not produced before appellants filed this action, and apparently it still has not been produced.

In the operative first amended complaint, Saro alleges he is owed money under the agreement. In their summary judgment motion, respondents argued Saro is not owed any money under the agreement because they repaid his $25,000 contribution (by a check made payable to his relative, Sam), notwithstanding that The Blob was not produced, Saro did not elect to receive reimbursement from AGR on The Barrens or Silent Night, and, even if he had, neither of those films generated AGR. We discuss more fully below the parties' arguments and evidence in connection with the summary judgment motion.

## B.    Plaintiff and appellant Ghazarian

On April 14, 2011, Ghazarian (through his business entity, Car Expert) entered into a "Development Funds Investment Agreement" with Genre. Thereunder, Ghazarian contributed

4

$100,000, and he and Genre agreed to the terms summarized above in our discussion of Saro's Development Funds Investment Agreement with Genre.

In the first amended complaint, Ghazarian alleges he is owed reimbursement (115% of his contribution under the terms of the agreement), and he is entitled to quarterly statements and accounting records from respondents and associate producer credit, under the agreement. In their summary judgment motion, respondents argued Ghazarian is not owed reimbursement under the agreement because The Blob was not produced, Ghazarian did not elect to receive reimbursement from AGR on The Barrens or Silent Night, and, even if he had, neither of those films generated AGR. Respondents also argued Ghazarian cannot receive associate producer credit on The Blob because the film was not produced, and the agreement does not include a provision requiring respondents to provide him with quarterly statements and accounting records. We discuss more fully below the parties' arguments and evidence in connection with the summary judgment motion.

### C.    Plaintiff and appellant Good Vibes

On September 19, 2012, Good Vibes entered into a "Funds Investment Agreement" with Genre regarding development of The Blob and "Stephen King's Cell." Thereunder, Good Vibes contributed $85,000, and Good Vibes and Genre agreed Genre "will utilize the Contribution to pay for any development or overhead costs Company [Genre] deems appropriate." Good Vibes is entitled to reimbursement under the agreement as follows: "Investor [Good Vibes] shall be entitled to receive fifty percent (50%) of the Reimbursement amount [defined in the agreement as 115% of Good Vibes's contribution], equivalent to

5

Forty-Eight Thousand Eight Hundred Seventy-Five United States Dollars (U.S. $48,875.00) from Stephen King's Cell and the remaining fifty percent (50%) of the Reimbursement amount, equivalent to Forty-Eight Thousand Eight Hundred Seventy-Five United States Dollars (U.S. $48,875.00) from The Blob's production financing.  Investor shall be reimbursed this amount no later than the conclusion of production from Stephen King's Cell and The Blob."  If either film "has not commenced principal photography on or prior to the Deadline [defined as nine months after the date of the agreement], then Investor has the right to extend the term of this agreement, indefinitely, until Company secures financing for production of the Picture and the Picture commences principal photography.  Alternatively, Investor may elect to receive Reimbursement from Company's share of [AGR] on future Company projects."  The agreement also provides for contingent compensation (an enumerated percentage of AGR on Stephen King's Cell and The Blob) and an associate producer credit on these films.  The agreement states Genre "has not made and specifically does not make any express or implied representation, warranty, guarantee or agreement as to the amount of Gross Receipts or Adjusted Gross Receipts which will be derived or received from the distribution or other exploitation of any of the Pictures."  The agreement also requires Genre to send Good Vibes "quarterly statements relating to the distribution of the picture for which Investor's Contribution was utilized for the first two (2) years after the date of first general release of such Picture in the U.S." and to provide additional statements thereafter as specified in the agreement.

The film "Cell" was produced, and in February 2013, Genre reimbursed Good Vibes $48,875 for its investment in Cell.  One of

Good Vibes's principals, Vagram Shalvardzhyan (who signed the Funds Investment Agreement on behalf of Good Vibes), received an associate producer credit on Cell. As discussed above, The Blob was not produced before appellants filed this action, and apparently it still has not been produced.

In the first amended complaint, Good Vibes alleges it is owed reimbursement (115% of its contribution under the terms of the agreement), and it is entitled to quarterly statements and accounting records from respondents and associate producer credit, under the agreement. Good Vibes acknowledges Genre reimbursed $48,875 of its contribution. In their summary judgment motion, respondents argued Good Vibes is not owed reimbursement of the other half of its contribution under the agreement because The Blob was not produced, Good Vibes did not elect to receive reimbursement from AGR on another of Genre's film projects, and none of Genre's films (Cell, Silent Night, and The Barrens) generated AGR. Respondents also asserted Good Vibes cannot receive associate producer credit on The Blob because the film was not produced, and one of its principals received associate producer credit on Cell. Respondents further argued that if Genre failed to provide quarterly statements for Cell, Good Vibes cannot demonstrate it was damaged by such a failure because Genre paid Good Vibes reimbursement of 115% of its contribution for Cell, and none of the films at issue have generated AGR. We discuss more fully below the parties' arguments and evidence in connection with the summary judgment motion.

## II. The Operative First Amended Complaint

In September 2016, appellants and 11 other plaintiffs who invested with Genre or Elysium filed this action against

Respondents.[2]  On December 12, 2018, after the parties conducted discovery, appellants and the other plaintiffs filed the operative first amended complaint, asserting causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, anticipatory breach of contract, fraud, promissory fraud, negligent misrepresentation, violation of Penal Code section 496 (receiving stolen property),[3] unjust enrichment, declaratory judgment,[4] and violation of Business and Professions Code section 17200.

In the first amended complaint, Good Vibes alleges respondents breached their written agreement with Good Vibes by failing to "[r]eimburse Good Vibes . . . as per the terms of the agreement"; by failing to "[p]rovide quarterly statements and accounting records"; and by failing to "[c]redit Good Vibes . . . as an associate producer in Cell and/or other productions."

[2] As set forth above, "appellants" refers to Ghazarian, Saro, and Good Vibes.  "Respondents" refers to Genre, Elysium, Saperstein, and Witten.  We use "plaintiffs" below to refer collectively to the 14 plaintiffs who brought this action against respondents, 11 of whom are not parties to this appeal.

[3] Plaintiffs allege in the first amended complaint that respondents "received and/or withheld Plaintiffs' monies in a manner constituting theft under Penal Code § 496," a statute criminalizing receipt of stolen property.

[4] Appellants and the other plaintiffs seek a declaratory judgment relating to certain terms in the agreements.  They "seek judicial determination resolving the issue of the interest rates, penalties, and contingent compensation."  It is not clear how this cause of action relates to the agreements at issue in this appeal.

Ghazarian alleges respondents breached their written agreement with him by "failing to reimburse [him] the total principal amount of $100,000 (USD) on or before the first day of principle [*sic*] photography for The Blob";[5] by failing to "[p]rovide quarterly statements and account records"; and by failing to "[c]redit [him] as associate producer in The Blob and/or other film and television projects." Saro alleges respondents breached their written agreement with him "by failing to reimburse [him] as per the terms of the agreement." Appellants (and the other plaintiffs) allege respondents breached the implied covenant of good faith and fair dealing by failing to "[r]eimburse the provided funds" and by failing to "[p]rovide statements and accounting of the use of the monies." They further allege the written agreements are "anticipatorily breached" because respondents "have, through their actions, clearly and positively indicated that they will not or cannot perform the requirements of the parties' agreements and contracts."

Appellants (and the other plaintiffs) allege in the first amended complaint that Saperstein made representations to them relating to the terms of the written agreements. The alleged representations are listed as relating to all plaintiffs, collectively, and include that Saperstein "would provide statements and accounting for the projects so as to keep Plaintiffs apprised as to the progress and happenings"; that plaintiffs "would receive high interest rate returns on the funds loaned, further compensation contingent on [AGR] and proceeds from

---

[5] As discussed above, The Blob was not produced. The first day of principal photography for The Blob did not occur.

9

[respondents'] projects, and/or penalties[6] in the event that [respondents] were unable to reimburse the money provided within the agreed-upon timeframe," as "included" in "express language in the agreements"; and that plaintiffs "would be credited in the motion picture films, television productions, and/or projects to which the funds loaned were used to create or produce." In the fraud cause of action, plaintiffs allege these representations were material and substantially false. Plaintiffs further allege they "reasonably relied upon [respondents'] representations which were used to induce[] Plaintiffs to execute the agreements and to provide [respondents] with large sums of money."[7] Appellants contend the 14 plaintiffs provided a total of $1,082,000 to respondents.[8]

As relevant to appellants' claims against respondents, the cause of action for violation of Business and Professions Code section 17200 alleges respondents "fraudulently induced Plaintiffs to repeatedly delay collection of outstanding payments with false representations of guaranteed future success."

---

[6] It is not clear from the record before us what this reference to "penalties" means and how it relates to appellants, if at all.

[7] Plaintiffs' causes of action for promissory fraud and negligent misrepresentation are based on the same alleged representations that form the basis of their fraud cause of action.

[8] We do not discuss in this opinion the allegations of the other 11 plaintiffs regarding how much they claim to be owed under their agreements because that is not germane to the issues on appeal.

10

The first amended complaint includes a group of allegations under the heading, "As to Defendant Saperstein's Dominion & Control Over the Corporate Entities" (Genre and Elysium). Therein, plaintiffs allege upon information and belief, among other things, that Saperstein used Genre and Elysium "as shells in order to move, transfer, and/or hide funds and money"; that Genre and/or Elysium "have been inadequately capitalized"; that Genre and Elysium are Saperstein's "alter egos"; that "there has been a failure to distinguish between Richard Saperstein's personal assets and the assets of [Genre and Elysium]"; and that Genre and/or Elysium "were created for the purposes of avoiding an obligation and/or perpetuating a fraud." Under this same heading in the first amended complaint, plaintiffs allege, "It would be an inequitable result for Richard Saperstein's actions to be treated as distinct from those of [Genre and/or Elysium]."

The first amended complaint identifies "Schur & Sugarman" as "Doe Defendant 1." Plaintiffs allege Schur and Sugarman provided management and accounting services to Genre and Elysium. Under a section of the first amended complaint labeled "Parties," plaintiffs allege upon information and belief, among other things, that Schur & Sugarman conspired with Saperstein in "failing to maintain accurate books and records, by agreeing that Saperstein could undercapitalize [Genre and Elysium], [and] by failing to follow proper formalities." Plaintiffs also allege upon information and belief in the "Parties" section of the first amended complaint that Schur & Sugarman, "in their position as signatories to the business accounts" of Genre and Elysium, "knew about and facilitated and agreed to the fraud by failure to disclose and conversion of funds by Saperstein to personal uses. . . ." Plaintiffs further allege

11

Schur & Sugarman knew Genre and Elysium "went many years without revenue, knew and facilitated the use of one investor's funds to repay another, and knew, agreed to and facilitated the conversion by Saperstein of such funds to personal uses." There is nothing in the record before us showing Schur & Sugarman's involvement, if any, in the litigation below, and Schur & Sugarman is not a party to this appeal. There are no other allegations in the first amended complaint—aside from those in the paragraph regarding Schur & Sugarman in the "Parties" section—that allege Saperstein converted investor funds to his personal use or used one investor's funds to pay another; and there is no indication in the first amended complaint that any of the causes of action is based on such alleged conduct by Saperstein.

## III. The Motions for Summary Judgment

In March 2019, respondents filed 13 motions for summary judgment/summary adjudication, including the three motions at issue in this appeal.

### A. Summary judgment motion against Saro

In their motion for summary judgment/summary adjudication against Saro, respondents asserted Saro cannot establish breach of contract because respondents reimbursed Saro's $25,000 contribution, notwithstanding that The Blob was not produced, Saro did not elect to receive reimbursement from AGR on The Barrens or Silent Night, and, even if he had, neither of those films generated AGR. In connection with their motion, respondents presented a check for $25,000, dated August 5, 2011, and made payable to Sam Diashian, Saro's relative. In a declaration in support of respondents' motion against Saro, Saperstein stated this $25,000 check was for reimbursement of

12

Saro's contribution.  Respondents presented three agreements between Genre and Sam and/or his company, Diashian Consulting, under which Sam invested $100,000 for development of The Blob and Sam/Diashian Consulting lent Genre an additional $72,000 for development of Silent Night and The Barrens, for a total contribution of $172,000.  Respondents also presented checks and wire transfers to Diashian Consulting totaling $177,750.  In his declaration, Saperstein stated these checks and wire transfers to Diashian Consulting reimbursed Sam/Diashian Consulting under their agreements with Genre; and the $25,000 check, dated August 5, 2011 was reimbursement for Saro's $25,000 contribution, although the check was made payable to Sam.

Respondents asserted in their motion that Saro cannot establish breach of the implied covenant of good faith and fair dealing because Genre reimbursed his contribution, and the agreement does not include a provision requiring Genre to provide Saro with statements or an accounting.  These are the only two ways alleged in the first amended complaint that respondents breached the implied covenant of good faith and fair dealing.  Respondents also produced evidence that none of its films generated AGR, to the extent Saro claims he is entitled AGR under the agreement.

Respondents asserted in their motion that Saro cannot establish anticipatory breach because respondents "never expressly repudiated the [agreement] by an unequivocal refusal to perform."  In his declaration, Saperstein stated Genre is still developing The Blob and "stands ready to honor the terms" of the agreement if The Blob is produced and other contingencies occur (the films referenced in the agreement generate AGR).

13

Respondents asserted in their motion that Saro cannot establish fraud because none of the alleged misrepresentations he identified in his discovery responses are actionable as fraud; and he cannot establish he was damaged as a result of any of the misrepresentations because Genre reimbursed his contribution, and he was not entitled to any additional compensation under the agreement. The three alleged misrepresentations on which Saro bases his fraud cause of action, as set forth in his discovery responses are: (1) Genre stated in the agreement it was the sole owner of all rights in and to The Blob; (2) Genre stated in the agreement it would provide quarterly reports and maintain auditable records; and (3) Genre stated in the agreement that Saro's investment would be for "Company" use. As to alleged misrepresentation (1), Saperstein stated in his declaration, "The reason why The Blob has not yet been made into a film is because Genre has not been able to raise enough money to produce it, not because it does not have the necessary rights." (Italics omitted.) As to alleged misrepresentation (2), the agreement between Saro and Genre does not contain such a provision regarding reports and records, and Saro could not identify in his discovery responses an oral representation regarding reports and records. As to alleged misrepresentation (3), respondents presented evidence demonstrating they spent more money on development of The Blob than Saro invested. Thus, respondents argued Saro could not establish his contribution, which respondents asserted was reimbursed, was not put to company use. For the same reasons, respondents argued Saro cannot establish negligent misrepresentation.

Respondents asserted in their motion that Saro cannot establish promissory fraud because the agreement contains an

14

integration clause, and based on his discovery responses, Saro has no evidence respondents did not intend to perform their alleged promises.

With respect to Saro's cause of action for violation of Penal Code section 496, respondents asserted Saro's discovery responses demonstrate he has no evidence that respondents knowingly received stolen property.

Finally, with respect to Saro's causes of action for unjust enrichment, declaratory judgment, and violation of Business and Professions Code section 17200 seeking restitution, respondents argued the agreement limits Saro's remedies to damages at law. In addition, respondents asserted Saro cannot establish respondents were unjustly enriched; the issues Saro seeks to have adjudicated in his cause of action for declaratory judgment are covered by other causes of action; and Saro cannot establish respondents acted unfairly or illegally within the meaning of Business and Professions Code section 17200.

### B.     Summary judgment motion against Ghazarian

In their motion for summary judgment/summary adjudication against Ghazarian, respondents asserted Ghazarian cannot establish they breached their written agreement with him by failing to reimburse him when Genre began principal photography on The Blob and by failing to give him associate producer credit on The Blob, as he alleged in the first amended complaint, because The Blob was not produced. Accordingly, the first day of principal photography for The Blob did not occur, and Genre could not give Ghazarian associate producer credit on a film that was not made. Ghazarian also alleged in the first amended complaint that respondents breached the agreement by failing to provide quarterly statements and account records, but

15

as respondents pointed out in their motion, the agreement does not include a provision requiring respondents to provide him with such statements and records.

Respondents asserted in their motion that Ghazarian cannot establish breach of the implied covenant of good faith and fair dealing based on his allegations in the first amended complaint that Genre failed to reimburse his contribution and failed to provide statements and accounting. Respondents argued Ghazarian is not owed reimbursement of his contribution under the agreement because The Blob was not produced, Ghazarian did not elect to receive reimbursement from AGR on The Barrens or Silent Night, and, even if he had, neither of those films generated AGR. And, as set forth above, the agreement does not include a provision requiring respondents to provide him with statements and accounting, and respondents argue there is no basis to imply such a term.

With respect to the causes of action for anticipatory breach, promissory fraud, negligent misrepresentation, violation of Penal Code section 496, unjust enrichment, declaratory judgment, and violation of Business and Professions Code section 17200, respondents made the same arguments they made in their motion against Saro, as summarized above.

Respondents asserted in their motion that Ghazarian cannot establish fraud because he could not identify in his discovery responses any specific statement on which he based his fraud cause of action; he did not have evidence that any alleged misrepresentation was false, based on his discovery responses; and he did not have evidence that respondents knew any alleged misrepresentation was false, based on his discovery responses.

16

As respondents noted, in his discovery responses, Ghazarian identified three alleged misrepresentations:

"1. Misrepresentation that [respondents'] business was successful and capable of repaying the short-term loans on time.

2. Misrepresentation that Elysium Films was worth millions of dollars as a company.[9]  3. Misrepresentation that everyone would get paid as long as [respondents] continued to make films." Respondents pointed out that Ghazarian did not identify in his discovery responses any writing or oral statement that included any of the alleged misrepresentations.

## C.    Summary judgment motion against Good Vibes

In their motion for summary judgment/summary adjudication against Good Vibes, respondents asserted Good Vibes cannot establish they breached their agreement by failing to reimburse half of Good Vibes's contribution, as Good Vibes is not owed such reimbursement because The Blob was not produced, Good Vibes did not elect to receive reimbursement from AGR on another of Genre's film projects, and none of Genre's films (Cell, Silent Night, and The Barrens) generated AGR. Respondents also asserted they did not breach the agreement by failing to give Good Vibes associate producer credit, as Good Vibes cannot receive associate producer credit on The Blob because the film was not produced, and one of its principals received associate producer credit on Cell.  Respondents further argued that if Genre failed to provide quarterly statements for Cell as required under the agreement, Good Vibes cannot demonstrate it was damaged by such a failure because Genre

---

[9] Ghazarian entered into the Development Funds Investment Agreement with Genre.

17

paid Good Vibes reimbursement of 115% of its contribution for Cell, and the film has not generated AGR. For the same reasons, respondents also asserted they did not breach the implied covenant of good faith and fair dealing by failing to reimburse Good Vibes' contribution and failing to provide quarterly statements.

With respect to the causes of action for anticipatory breach, promissory fraud, negligent misrepresentation, violation of Penal Code section 496, unjust enrichment, declaratory judgment, and violation of Business and Professions Code section 17200, respondents made the same arguments they made in their motion against Saro, as summarized above.

As respondents pointed out in their motion, in its discovery responses, Good Vibes identified documents (emails) it contended contained misrepresentations. Respondents asserted Good Vibes cannot establish fraud because it did not have evidence that any alleged misrepresentation was false, based on its discovery responses; and Good Vibes did not have evidence that respondents knew any alleged misrepresentation was false, based on its discovery responses. We need not summarize herein the contents of these documents because Good Vibes does not raise any issue on appeal related to these emails.

IV. **Opposition to Motions for Summary Judgment, Evidentiary Objections, and Reply Briefs**

A. **Opposition to summary judgment motions**

In May 2019, plaintiffs filed a 26-page combined "omnibus opposition" to respondents' 13 motions for summary judgment/summary adjudication. Therein, they asserted each written agreement "has a specified due date ('Deadline') within which [respondents] were obligated to pay the Reimbursement

18

regardless of whether any film or other project specified in the contract was produced, financed, or profitable."[10] In the alternative, they argued respondents "constructively abandoned" The Blob and were required to reimburse appellants' contributions within a reasonable time after such constructive abandonment. In support of this latter argument, plaintiffs cited the Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC), providing in pertinent part: "An entity shall periodically review properties in development to determine whether they will ultimately be used in the production of a film. It shall be presumed that an entity will dispose of a property (whether by sale or abandonment) if it has not been set for production within three years from the time of the first capitalized transaction." (*Id*. at § 926-20-40-1, bold font omitted.)

Plaintiffs argued in their opposition that their causes of action were also based on respondents' misuse of investor funds and operation of an unlawful Ponzi scheme. Plaintiffs asserted: "As it happens, [respondents] did not use [plaintiffs'] Contributions only to pay development costs. [Respondents] diverted investor funds to Saperstein, Witten and their affiliated companies by making 'loans' and unauthorized distributions of 'production equity' from Genre and Elysium; [respondents] used investor funds to pay general and administrative expenses, 'business management fees' and 'legal fees' not authorized for

---

[10] As set forth above, the agreements at issue here state if principal photography has not commenced on The Blob by the "deadline," as defined in each agreement, appellants may elect to receive their reimbursement from AGR, if any, on Genre's other films.

payment under the Contracts; and [respondents] used the Contributions and other investor funds to operate an unlawful 'Ponzi scheme.' "

Plaintiffs asserted respondents defrauded them by misrepresenting how their contributions would be used; by "making false guarantees that Plaintiffs would be paid from any funds that [respondents] actually received from the exploitation of" The Barrens, Silent Night, and Cell; and by misrepresenting that The Blob was " 'set for production.' "

Plaintiffs argued respondents violated Penal Code section 496, receipt of stolen property, based on their assertion "Saperstein simply took Plaintiffs['] investment money, deposited a large percentage in his bank account and reported it as 'loans to shareholder.' "

Plaintiffs also asserted they were "entitled to a declaration from the Court that the terms of the contract[s] at issue should be interpreted, as it relates to development costs etc., as understood in the [film] industry. Such a declaration will assist the parties in reaching an adjudication."

### B.     Plaintiffs' Proposed Expert's Declaration

In support of their assertions and arguments regarding respondents' misuse of investor funds and operation of a Ponzi scheme, plaintiffs relied on the declaration of Michael McEwen, dated May 17, 2019. Therein, McEwen set forth his qualifications as follows:

"I am a Certified Public Accountant (CPA) licensed to practice in the State of California. I also have a master's in business administration. I am certified in Financial Forensics (CFF) by the AICPA. In addition to these formal credentials, for the past 22 years I have acted in either the capacity as a

20

detective or Sargent in economic crimes for the San Diego Police Department.  As a detective in the Economics Crimes Section I have used my forensic accounting expertise in conducting investigations into various sophisticated fraud schemes.  My assignments have included two Federal Task Forces, United States Secret Service Regional Fraud Task Force and the Internal Revenue Service-Criminal Investigation (IRS-CI) Southwest Border Financial Crimes Task Force.  Prior to joining the San Diego Police Department, I worked for nearly ten years as a forensic account[ant], auditor, and director for two of the 'Big Four' international public accounting firms (Price Waterhouse Coopers and KPMG) and an international engineering and construction company.  As an accountant and detective, I have conducted many investigations into thefts from business and individuals.  As a forensic accountant and financial expert, I have worked and consulted with the San Diego Police Department Homicide Unit, United States Secret Service, FBI, and Homeland Security on cases involving murder for financial gain, money laundering, Ponzi schemes, probate fraud, bank fraud, real estate fraud and tax fraud.  During these investigations, I have spoken with numerous victims, witnesses and suspects of said crimes.  From these conversations and training, I learned the different methods by which suspects commit these crimes as well as the manner in which they attempt to hide them from their victims and law enforcement.  Most importantly, I have experience in working in the film industry as an auditor for Tri-Star Motion pictures, and motion picture royalty and pension audits for the Screen Actors Guild.  As a point of interest, I handled some original M.A.S.H. audits."

McEwen stated he was "retained by Plaintiffs' counsel as a forensic expert to review the financial books and records of [respondents] and render findings about whether [respondents] used Plaintiffs' investment/loan money for its intended purpose and whether there are badges of fraud associated with these transactions."

McEwen described in his declaration certain costs and expenses that do and do not constitute "film costs" and "development costs." McEwen asserted: "To be sure, development costs do not include general expenses of [Genre and Elysium], such as attorney fees, accounting fees, paying back interest or principal to prior investors, or more specifically paying back Saperstein's undocumented and yet alleged shareholder loans he made to either of these corporations."[11]

McEwen stated that based on his review of Genre's and Elysium's banking records, respondents converted some of plaintiffs' investment funds for their personal use. McEwen also asserted: "As a law enforcement officer, it is my opinion that [respondents] have fraudulently converted investor funds and have violated Penal Code section 487(a) [grand theft], a felony."

_____

[11] Saperstein testified at his deposition, and respondents produced spreadsheets indicating, that Saperstein lent over $4 million to Genre and Elysium between 2007 and 2018, and Genre and Elysium made payments to Saperstein to repay the loans. As McEwen stated in his declaration, Genre's tax returns during this period do not reflect the loans listed in respondents' spreadsheet. McEwen asserted the companies' payments to Saperstein were loans *to* Saperstein and not repayment of loans *from* Saperstein.

In his declaration, McEwen stated he required access to Saperstein's bank records "so that light may be shed on the entire Ponzi scheme."  He further stated:  "These banking records are critical in proving both the fraud and breach of contract claims because they will demonstrate that the money invested was not used as set forth in the various complaints [*sic*]."

As we explain below, the trial court sustained respondents' objections to all of McEwen's assertions and conclusions summarized above.

### C.  Appellants' separate statements of disputed material facts and declarations

Appellants each filed a separate statement of disputed material facts and an individual declaration.  As we discuss below, the separate statements are defective in that they are filled with pages of improper argument and do not link alleged disputed facts with the specific evidence on which appellants base their purported disputes.

In his separate statement of disputed material facts, Saro disputed Genre repaid his $25,000 contribution.  He disputed this fact by stating the check respondents presented was not made out to him.  In his declaration, however, Saro did not reference the check, and he did not deny he received the proceeds from the check.  In discussing the terms of his agreement with Genre, Saro stated in his declaration, "I am owed the principal amount of $25,000 plus interest . . . ."

### D. Respondents' evidentiary objections and reply brief

Respondents filed written objections to plaintiffs' evidence.[12] The only objections and rulings that are at issue on appeal are respondents' objections to McEwen's declaration. Respondents objected to numerous statements in McEwen's declaration, including the assertions and conclusions summarized above, on grounds (1) the declaration does not show McEwen is competent to testify "as an expert on any film industry accounting issues," and (2) the statements are conclusory and lack foundation because "McEwen states conclusions and does not state the basis for his opinions."

Respondents filed separate reply briefs in support of their motions for summary judgment/summary adjudication against appellants. Respondents argued, among other things, that the trial court should not consider theories raised in the omnibus opposition that respondents contended were not pleaded in the first amended complaint: alleged misuse of investor funds, and operation of a Ponzi scheme. Respondents also urged the trial court to deny a continuance so plaintiffs could obtain Saperstein's personal banking records. Respondents asserted such records would only pertain to theories that plaintiffs did not plead in the first amended complaint.

---

[12] Plaintiffs also filed written evidentiary objections, which the trial court overruled. In this appeal, appellants do not challenge the trial court's rulings on their evidentiary objections.

### E. Trial court's order allowing plaintiffs access to some of Saperstein's banking records

On May 31, 2019, before ruling on plaintiffs' motions for summary judgment/summary adjudication, the trial court ruled plaintiffs could obtain Saperstein's banking records by subpoena for the period January 1, 2011 to December 31, 2012, and plaintiffs obtained these records. The court found, "Plaintiffs have provided a compelling reason for the discovery of Defendant Saperstein's bank records, as they are directly relevant to the lawsuit based upon the Plaintiffs' allegations, including alter ego liability, and the transfers shown by Plaintiffs that were made to Defendant's personal bank account. Therefore discovery of the records are essential to a fair determination of the action." The court further stated: "If Plaintiffs can provide the Court with sufficient evidence of '[P]onzi scheme' activity or improper use of investment funds warranting expanding the time period, they may request such by way of an Informal Discovery Conference with the Court, and a motion to compel to follow if necessary."

The trial court did not allow plaintiffs to obtain additional personal banking records from Saperstein. Plaintiffs did not seek leave to amend their complaint to plead misuse of investor funds or operation of a Ponzi scheme.

### F. Supplemental opposition to summary judgment motions and supplemental declaration of McEwen

In September 2019, plaintiffs filed a "supplemental omnibus opposition" to the 13 motions for summary judgment/summary adjudication. Plaintiffs maintained that the trial court should deny respondents' summary judgment motions based on their Ponzi scheme and misuse of investor funds

theories.  Plaintiffs did not address respondents' arguments in their previously filed reply briefs that these theories were not pleaded in the first amended complaint.  Plaintiffs further asserted, based on a supplemental declaration of McEwen, that during 2011 and 2012 Saperstein "embezzled a total of $853,682.90 by transferring investor money to his personal account from the Genre and Elysium bank accounts," and he used the majority of the money "for his own personal use."  McEwen stated in his supplemental declaration that, after reviewing Saperstein's personal banking records for 2011 and 2012, he "reconfirmed Mr. Saperstein is operating a Ponzi Scheme."

G.  **Respondents' supplemental evidentiary objections and reply brief**

Respondents objected to the assertions and conclusions in McEwen's supplemental declaration on the same grounds they objected to his original declaration:  (1) McEwen is not qualified as an expert on the subject to which his opinions relate, and (2) the statements are conclusory and lack foundation.

In their reply to plaintiffs' supplemental omnibus opposition, respondents argued the Ponzi scheme and misuse of investor funds theories are irrelevant to the motions for summary judgment/summary adjudication because the theories were not pleaded in the first amended complaint.  Respondents also pointed to evidence they produced indicating respondents spent over $2.5 million on development of the films.  Respondents denied Saperstein embezzled any money, and pointed to evidence they produced indicating transfers to Saperstein from Genre and Elysium in 2011 and 2012 repaid earlier loans Saperstein made to his companies.  With this reply brief, respondents submitted a declaration of Saperstein and attached the evidence they cited.

26

## V.     Rulings on Motions for Summary Judgment

At an October 31, 2019 hearing on some of the summary judgment motions, the trial court asked plaintiffs' counsel to reference allegations in the first amended complaint that articulate a Ponzi scheme theory.  Plaintiffs' counsel responded, "A Ponzi scheme is not asserted in the first amended complaint." Respondents' counsel noted that plaintiffs' counsel served them with a declaration of McEwen that advanced a Ponzi scheme theory in October 2018 (apparently in connection with a discovery matter).  Two months later, in December 2018, plaintiffs filed their first amended complaint and did not include a Ponzi scheme or misuse of investor funds theory as the basis for any of their causes of action.

On June 26, 2020, the trial court issued a 216-page ruling on many of the motions for summary judgment/summary adjudication, including the three motions at issue in this appeal. The court sustained respondents' evidentiary objections, including the objections to the assertions and conclusions in McEwen's declaration and supplemental declaration.  The court sustained the objections on both grounds asserted by respondents:  (1) that McEwen "has not established that he is qualified as an expert on the particular subject to which the opinion relates, i.e., accounting issues pertaining to development of independent films"; and (2) that McEwen "does not lay a sufficient foundation" for the statements.

The trial court granted respondents' summary judgment motions against appellants and entered judgments in favor of respondents.  We address below two portions of the court's ruling that relate specifically to arguments appellants raise in this appeal.

27

The trial court stated in its ruling as to each appellant: "Plaintiff attempts to raise a triable issue by arguing that [respondents] misused Plaintiffs' funds and engaged in a 'Ponzi' scheme. [Citation.] [Respondents] argue that these arguments exceed the scope of the FAC [first amended complaint] and therefore it would be inappropriate for the Court to deny [respondents'] motion on unpled theories. In Opposition and in the Supplemental Opposition, Plaintiff failed to respond to [respondents'] argument on this point. At previous oral argument hearings, the Court asked Plaintiffs whether any allegations in the FAC allege misuse of funds or a 'Ponzi' scheme, and Plaintiffs failed to point the Court to any allegations in the FAC where these theories are alleged. Therefore, the Court finds that it would be inappropriate to deny [respondents'] motion based on theories not alleged in the FAC and does not consider Plaintiff's arguments on misuse of funds or 'Ponzi' scheme."

As to Saro, the trial court concluded he may not argue respondents breached the written agreement or implied covenant of good faith and fair dealing by failing to pay contingency compensation, as plaintiffs collectively argued in their omnibus opposition. The court found he only alleged in the first amended complaint that respondents breached the agreement between him and Genre by failing to reimburse his contribution, and breached the implied covenant by failing to provide statements and failing to reimburse his contribution. In any event, the court found Saro did not raise a triable issue of fact that he was entitled to contingency compensation. The court made consistent rulings on this issue against Ghazarian and Good Vibes, based on their decision not to plead respondents' failure to pay contingency compensation constitutes a breach.

28

## DISCUSSION

In their appellate briefing, appellants do not contend respondents failed to meet their burden on summary judgment. In their opening appellate brief, appellants contend: (1) the trial court abused its discretion in sustaining respondent's objections to McEwen's declarations as to one of the two grounds respondents raised (although the court sustained the objections on both grounds); (2) the court erred in declining to consider appellants' Ponzi scheme and misuse of investor funds theories based on its conclusion the theories were not pleaded in the complaint; (3) the court erred in declining to consider plaintiffs' collective argument in the omnibus oppositions regarding plaintiffs' entitlement to contingent compensation based on its conclusion appellants did not allege their specific claims of breach were based on a failure to pay contingent compensation; and (4) there are triable issues of material fact as to whether respondents abandoned the production of The Blob and were required to reimburse appellant's contributions within a reasonable time thereafter. Appellants further contend, even if this court upholds the trial court's evidentiary rulings on respondents' objections to McEwen's declarations, appellants have shown triable issues of material fact precluding summary judgment. For the reasons explained below, we reject appellants' contentions and affirm the summary judgments.

## I.    Standard of Review

A trial court should grant summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)[13] A defendant may establish a right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (§ 437c, subd. (p)(2).) Once the moving defendant has satisfied this burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to each cause of action. (*Ibid*.) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

"We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained." (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65-66.) We view the evidence and the inferences reasonably drawn from the evidence "in the light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 843.)

## II. Defects in Appellants' Papers

Before we address the contentions appellants raise in this appeal, we must note defects in appellants' papers below and on appeal that interfere with our ability to review the contentions.

First, appellants' separate statements of disputed material facts do not link alleged disputed facts with the specific evidence on which they base the purported dispute, in violation of statute and court rule. (§ 437c, subd. (b)(3) ["Each material fact

---

[13] Undesignated statutory references are to the Code of Civil Procedure.

30

contended by the opposing party to be disputed shall be followed by a reference to the supporting evidence.  Failure to comply with this requirement of a separate statement may constitute a sufficient ground, in the court's discretion, for granting the motion"]; Cal. Rules of Court, rule 3.1350(f)(2) ["An opposing party who contends that a fact is disputed must state, on the right side of the page directly opposite the fact in dispute, the nature of the dispute and describe the evidence that supports the position that the fact is controverted"].)  For the majority of the facts put forth by respondents that appellants contend are disputed, appellants improperly refer the court to pages of argument intermixed with citations to evidence, leaving it to the court to try to discern which evidence might support a claim that a particular fact is disputed.  This court is not tasked with attempting to match up appellants' asserted disputed material facts with admissible evidence to support them.

Second, in the statement of facts in their appellate briefing, appellants largely cite to their oppositions to the motions for summary judgment, rather than citing to admissible evidence. " ' "It is not the function of this court to comb the record looking for the evidence or absence of evidence to support [a party's] argument." ' "  (*Garcia v. Seacon Logix, Inc.* (2015) 238 Cal.App.4th 1476, 1489.)  Appellants must "point out portions of the record that support the position taken on appeal."  (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768.)

Third, aside from appellants' improper citation to McEwen's declarations, which we address below, appellants cite other evidence the trial court excluded, although they do not challenge the evidentiary rulings excluding such evidence.  For example, the trial court sustained respondents' objections to 10

31

exhibits attached to the declaration of appellants' counsel, Guy Jamison, on numerous grounds. In attempting to make their case that they have shown triable issues of material fact, appellants rely on four of these exhibits (numbered 128-131), purported summaries of respondents' financial records, without challenging on appeal the trial court's exclusion of this evidence.

We could affirm the summary judgments based on only these defects in appellants' papers below and on appeal. Instead, we review appellants' contentions on the merits, noting however that the defects in the papers make it difficult for us to review appellants' contention that they have shown a triable issue of material fact precluding summary judgment.

## III.   Sustained Objections to McEwen's Declarations

In its written ruling, the trial court sustained respondents' objections to McEwen's declarations on both grounds respondents raised in their written objections: (1) that McEwen "has not established that he is qualified as an expert on the particular subject to which the opinion relates, i.e., accounting issues pertaining to development of independent films"; and (2) that McEwen "does not lay a sufficient foundation" for the statements to which respondents objected. "A court's decision to exclude expert testimony" in connection with a motion for summary judgment "is reviewed for abuse of discretion." (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467.)

In their appellate briefing, appellants argue the trial court erred in sustaining the objections based on McEwen's qualification, but they ignore that the trial court also sustained the objections based on a lack of foundation for the particular statements made. Accordingly, we need not review appellants' challenge to these evidentiary rulings because even if we agreed

with appellants' argument, the evidence would remain excluded based on the ground appellants do not address. Respondents pointed out in their appellate brief that appellants did not address the other ground on which the trial court sustained the objections. In their reply brief on appeal, appellants again only focused on the trial court's exclusion of the evidence based on McEwen's qualification and did not argue the foundation for the statements to which respondents objected. Without addressing the alternative ground, appellants cannot demonstrate the court abused its discretion in excluding the evidence.

We summarized above the information the trial court excluded from McEwen's two declarations in sustaining respondents' objections, including the objections that there was a lack of foundation for the information. The excluded information includes, but is not limited to, McEwen's opinions (1) as to categories of expenditures respondents allegedly made that do not constitute development costs; (2) that Saperstein converted investors' contributions to his personal use; (3) that Saperstein embezzled $853,682.90; and (4) that respondents operated a Ponzi scheme. The trial court also excluded McEwen's calculations on which he based his opinions. Respondents had argued, in part, that the calculations lacked foundation and included mathematical errors.

## IV. Ponzi Scheme and Misuse of Investor Funds Theories

### A. Appellants Did Not Properly Plead These Theories in the First Amended Complaint

"The complaint limits the issues to be addressed at the motion for summary judgment. The rationale is clear: It is the allegations in the complaint to which the summary judgment

33

motion must respond. [Citation.] Upon a motion for summary judgment, amendments to the pleadings are readily allowed. [Citation.] If plaintiff wishes to expand the issues presented, it is incumbent on plaintiff to seek leave to amend the complaint either prior to the hearing on the motion for summary judgment, or at the hearing itself. [Citation.] To allow a party to expand its pleadings by way of opposition papers creates . . . an unwieldly process." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258.) "To allow an issue that has not been pled to be raised in opposition to a motion for summary judgment in the absence of an amended pleading, allows nothing more than a moving target. For . . . section 437c to have procedural viability, the parties must be acting on a known set stage." (*Ibid*., fn. 7.)

Appellants do not dispute that the words Ponzi and misuse do not appear in the first amended complaint. Nor do plaintiffs dispute that they referenced the Ponzi theory in connection with a discovery motion two months before they filed their first amended complaint. And yet they chose not to plead these theories in the first amended complaint as the bases for any of their causes of action against respondents. When respondents pointed out in their initial reply briefs in support of their summary judgment motions that appellants did not plead these theories, appellants did not seek leave to amend their complaint or address respondents' argument in their supplemental opposition to the summary judgment motions. After the initial round of papers were filed in connection with the summary judgment motions, the trial court allowed appellants to obtain two years of Saperstein's personal banking records, concluding the records related to appellants' alter ego theory pleaded in the first amended complaint. The court informed appellants in its

ruling:  "If Plaintiffs can provide the Court with sufficient evidence of '[P]onzi scheme' activity or improper use of investment funds warranting expanding the time period, they may request such by way of an Informal Discovery Conference with the Court, and a motion to compel to follow if necessary."  And yet appellants still chose not to seek leave to amend to plead how the Ponzi scheme and misuse of investor funds theories relate to their causes of action against respondents.

Appellants point to allegations in the first amended complaint, taken out of context, in arguing these theories are actually pleaded in the first amended complaint— notwithstanding that they could not point the trial court to any such allegations at a hearing on the summary judgment motions. Now, appellants point us to the paragraph about Schur & Sugarman under the "Parties" section of the first amended complaint (discussed above) and the allegations in the section of the first amended complaint regarding Saperstein's alleged dominion and control over Genre and Elysium, describing these entities as his alter egos (also discussed above).  These allegations do not indicate that a Ponzi scheme or misuse of investor funds are theories on which appellants' causes of action against respondents are based.  The trial court did not err in declining to consider these theories because they were not pleaded in the first amended complaint.

B.    In Any Event, Appellants Cannot Show a Triable Issue of Material Fact on These Theories

Even if we considered the Ponzi scheme and misuse of investor funds theories in reviewing respondents' summary judgment motions, appellants cannot show a triable issue of

35

material fact. These theories rely on McEwen's interpretation of, conclusions regarding, and calculations relating to respondents' financial documents. The trial court excluded these interpretations, conclusions, and calculations, and appellants cannot demonstrate the trial court abused its discretion, as discussed above, because appellants have not challenged the trial court's rulings that the interpretations, conclusions, and calculations lack foundation.

## V. Saperstein's Use of Company Funds

Appellants cite to Saperstein's deposition and Genre's and Elysium's tax returns in support of their claims that Saperstein made improper payments to himself and others from Genre's and Elysium's bank accounts. We need not address the propriety of any such payments because appellants have not shown a nexus between such payments and respondents' failure to reimburse appellants under the investment agreements. As explained above, under the investment agreements, appellants were entitled to reimbursement if certain contingencies occurred: Principal photography on The Blob commenced and/or the other films at issue generated AGR (assuming appellants elected to receive reimbursement from AGR, which they did not). Appellants have not raised a triable issue of material fact that the contingencies entitling them to reimbursement did not occur because Saperstein made payments to himself and others from Genre's and Elysium's bank accounts. Appellants cite to no admissible evidence indicating The Blob was not produced and/or the other films at issue did not generate AGR because Saperstein made such payments.

36

## VI.    Contingent Compensation

Appellants contend the trial court erred in declining to consider they are entitled to contingent compensation under the agreements. As set forth above, appellants' agreements with Genre provide that appellants are entitled to receive contingent compensation, defined as a certain percentage of AGR on Genre's films (as specified in each agreement), if any AGR is derived or received on the films. In the first amended complaint, appellants allege the specific ways in which they claim respondents breached the agreements. None of them allege respondents breached the agreement or the implied covenant of good faith and fair dealing by failing to pay contingent compensation. Again, appellants cite to general allegations in the first amended complaint that are not related to appellant's causes of action against respondents, in arguing they pleaded this theory of recovery.

Although appellants ask us to consider their entitlement to contingent compensation, they do not explain how they could show a triable issue of material fact warranting our reversal of the summary judgment motions. Respondents presented evidence indicating none of the films referenced in the agreements generated AGR, so appellants are entitled to no contingent compensation. In their appellate briefing, appellants do not direct us to any evidence indicating otherwise. " ' "It is not the function of this court to comb the record looking for the evidence or absence of evidence to support [a party's] argument." ' " (*Garcia v. Seacon Logix, Inc., supra*, 238 Cal.App.4th at p. 1489.)

## VII. Abandonment of Production of The Blob

Appellants contend they have shown a triable issue of material fact as to whether respondents abandoned production of The Blob and were required to reimburse appellants' contributions within a reasonable time thereafter. Appellants do not point to evidence disputing Saperstein's statements in his declaration that Genre is still developing The Blob and "stands ready to honor the terms" of the agreement if The Blob is produced and other contingencies occur (the films referenced in the agreement generate AGR).

As discussed above, appellants cite the FASB ASC, providing in pertinent part: "An entity shall periodically review properties in development to determine whether they will ultimately be used in the production of a film. It shall be presumed that an entity will dispose of a property (whether by sale or abandonment) if it has not been set for production within three years from the time of the first capitalized transaction." (*Id.* at § 926-20-40-1, bold font omitted.) But appellants do not explain how these accounting standards relate to respondents' obligations under the agreements. The agreements expressly contemplate that The Blob may not be produced, and that the other films may not generate any AGR.[14]

---

[14] In their reply brief on appeal, appellants argue there is a triable issue of material fact as to whether Genre reimbursed Saro's contribution by check made payable to his relative, Sam. We note Saro did not reference the check in his declaration or state therein that he did not receive the proceeds from the check. In any event, this fact is immaterial because The Blob has not been produced, and appellants have not shown the other films

Appellants have not demonstrated any error in the granting of the summary judgment motions.

## DISPOSITION

The judgments are affirmed.  Respondents are entitled to recover costs on appeal.

NOT TO BE PUBLISHED


CHANEY, J.

We concur:


ROTHSCHILD, P. J.


BENKE, J.*

---

generated AGR.  Appellants have not shown a triable issue of material fact that Saro is entitled to reimbursement under the agreement for the reasons discussed herein.

* Retired Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.